UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FRED NANCE, JR., | ) | |
| | ) | Case No. 16-CV-11635 |
| Plaintiff, | ) | |
| | ) | Judge Leinenweber |
| vs. | ) | |
| | ) | Magistrate Cox |
| NBCUNIVERSAL MEDIA, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY MEMORANDUM IN SUPPORT OF
THE UNIVERSAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

As an initial matter, in his response to the Universal Defendants' motion for summary judgment, Plaintiff Fred Nance, Jr. effectively abandons his race discrimination claims arising out of Season 1 of *Chicago Med* because he fails to respond to the Universal Defendants' argument that casting decisions are protected by the First Amendment (Docket No. 115 at 10-11). As shown in the Universal Defendants' opening brief and below, Nance's remaining claims alleging that he was removed from *Chicago Med* because of his race and retaliated against in violation of the Equal Pay Act ("EPA") for opposing discriminatory pay practices also should be dismissed.[1]

The heart of this employment dispute is that Nance believes that the Universal Defendants treated him differently than Caucasian extras when the Universal Defendants instructed Empire Casting to stop casting Nance as a Core Extra on *Chicago Med* after an

---

[1] Plaintiff's memorandum in opposition is 33 pages long. Local Rule 7.1 imposes a 15-page limit on briefs filed in support as well as those in opposition. Plaintiff failed to seek prior approval from the court to file a brief with more than twice as many pages as permitted by LR 7.1, which also warns that any brief "that does not comply with this rule shall be filed subject to being stricken by the court."

1

investigation concluded that Nance threatened another extra while vying for screen time. Critically, other than Nance's own unsupported perceptions and beliefs, nothing suggests that the Universal Defendants ever concluded that another extra—Caucasian or African American—physically threatened another extra over screen time. Nor has Nance established that the wage claim he filed with the Illinois Department of Labor ("IDOL") constituted a protected activity under the EPA because Nance did not claim to have been paid differently than female extras. Consequently, the Universal Defendants are entitled to summary judgment on Nance's remaining claims against them.

## II.  ARGUMENT

### A.  The Universal Defendants' Factual Statements Supporting Summary Judgment Are Not Disputed

This court's Local Rules require a party opposing summary judgment to file a response to the movant's statement of facts, supported by record evidence and a memorandum of law. N.D. Ill. Loc. R. 56.1(b)(3)(C). Any facts not specifically controverted by the opposing party by citation to admissible record evidence are deemed to be admitted. *Id*.

The Universal Defendants' statement of facts contains 52 paragraphs. Nance responded by agreeing in whole or in part with 26 of the statements or admitting he does not have evidence to the contrary. (See Plaintiff's Response to NBC et al. & Empire Casting LLC Rule 56.1 Statement of Material Facts, hereinafter "Pl. Resp. to Facts," ¶¶ 1, 3, 4, 6, 8, 10, 11, 12, 20, 21, 23, 27, 31, 34-41, 45, 49-52). The remaining 26 statements also must be deemed admitted because Nance's responses, based exclusively on his declaration submitted with his brief, do not controvert the Universal Defendants' statements with citations to admissible record evidence or otherwise are improper.

Many of Nance's responses are not supported by admissible record evidence that controverts the Universal Defendants' statements. (Pl. Resp. to Facts ¶¶ 5, 7, 15-19, 22, 28, 42-44, 46, 48). "An answer that does not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record constitutes an admission." *Teninty v. Geren*, 776 F. Supp. 2d 725, 729-30 (N.D. Ill. 2011) (internal citations omitted). Nance's objections based solely on his unsupported beliefs and perceptions or that contain additional commentary not responsive to the statement of fact are improper responses, and those paragraphs (Pl. Resp. to Facts ¶¶ 15, 23, 29, 42-44, 47) must be deemed admitted. *Jagla v. LaSalle Bank*, No. 05 C 6460, 2006 WL 2796481, at *8 (N.D. Ill. Sept. 26, 2006) (response may not contain additional facts beyond the movant's statement because they must be submitted separately). Similarly, where Nance uses his response as an opportunity to argue the facts rather than admit or deny them (Pl. Resp. to Facts ¶¶ 9, 28-30, 32-33, 43-44, 47-52), his responses must be disregarded, and the facts be deemed admitted. *Id*.

      B.      <u>The Record Evidence Does Not Show That Nance Was Discriminated Against Because of His Race During Season 1 of Chicago Med</u>

Nance's race discrimination claims regarding Season 1 of *Chicago Med* fail for three critical reasons. **First**, there is no record evidence that Nance experienced an adverse action. Nance does not dispute the Universal Defendants' statements of fact establishing that he worked more hours and earned more money than any other extras portraying an ER doctor that season.[2] *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir.2009) ("[A]lthough the definition of an adverse employment action is generous, an employee must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of

---

[2] Indeed, Nance asserts that he "was highly chosen by Directors and the Script Supervisor and placed in prominent scenes on the Chicago Med television show." (Response to SMF ¶47). Nance further asserts that he "was chosen for prominent scenes in Season 1," as demonstrated by his photo exhibits. (Memo. p. 18).

real harm."). ***Second***, as noted above, Nance effectively abandons these claims because he fails to point to any cases holding that the First Amendment does not apply to casting decisions or explain why the opinions cited by the Universal Defendants are not applicable here. *See Claybrooks v. American Broadcasting Companies*, 898 F.Supp.2d 986, 1000 (M.D. Tenn. 2012) (rejecting claim under section 1981 holding that "the First Amendment protects the producers' right unilaterally to control their own creative content."). S*ee also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) ("a speaker has the autonomy to choose the content of his own message."). ***Third***, Nance fails to cite to record evidence supporting his denial of the Universal Defendant's statements establishing that television production is an expressive, artistic activity (Docket No. 128 at ¶¶ 13-14).

      C.    <u>Nance's IDOL Claim Does Not Constitute a Protected Activity Under the EPA</u>

Nance, as explained in the Universal Defendants' moving papers, made no mention of gender-based pay discrimination in the wage claim he filed with the IDOL in his September 2016 claim against Empire Casting. Unable to dispute this fact, Nance instead contends in his Rule 56.1 Statement that other extras were complaining to each other and, in some cases, to supervisors with no results, then adding that Christie Tate—a female extra—wanted to talk to Joan Philo about pay vouchers (Docket No. 130 at ¶ 30). Setting aside the inadmissibility of these alleged facts,[3] the mere fact that a female extra allegedly wanted to discuss pay vouchers with Ms. Philo does not convert Nance's IDOL claim into an activity protected by the EPA. Nance would have had to have asserted in his IDOL papers that he (or others) were being paid

---

[3] Complaints and/or comments attributed to other extras without supporting declarations or affidavits from those extras are inadmissible hearsay as they are offered to prove the fact asserted—that others also complained. *See* Fed. R. Evid. 801(c); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 368 (7th Cir. 1996) ("a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment").

differently than similarly situated extras because of gender—something that is unquestionably missing from the IDOL claim to which Nance refers here.[4]

The absence of an explicit—or even implied—discrimination claim is significant because Nance alleged in his Third Amended Complaint that he complained to the IDOL regarding an irregular pay schedule as a "result of his sex [given that] females received their checks regularly." (Docket No. 67 at ¶ 189.) This court, in denying the Universal Defendants' motion to dismiss Nance's EPA retaliation claim (Count IX), explained that it inferred that Nance meant to say that Empire Casting paid him irregularly because he is male. The IDOL complaint Nance includes with his Response contains no such allegation nor any language that could reasonably be read to assert or imply such a claim. Nance is thus unable to point to any record evidence suggesting that the decision to remove him from *Chicago Med* was motivated by an intent to retaliate against him for filing an IDOL claim against Empire Casting. *See, Krause v. City of LaCrosse*, 245 F.3d 995, 100 (7th Cir. 2001).[5]

D. The Record Evidence Does Not Show That Nance Was Removed from *Chicago Med* Because of His Race During Season 2

Nance relies, apparently, on two arguments in his attempt to avoid summary judgment on his claim that he was removed from *Chicago Med* because of his race; first, he takes issue with the manner in which the investigation was conducted, and second, he contends—without record support—that he was treated differently than other extras accused of making threats. Both arguments fail.

---

[4] In fact, Nance admits that "[t]here were male and female extras who experienced the same issue[.]" (Response to SMF ¶41).
[5] Nance's Title VII and Section 1981 retaliation claims were dismissed by the Court with prejudice on April 12, 2018 (Docket No. 90 at pages 13-14).

*1.     Universal Television Reasonably Relied on Philo's Investigation*

Nance, as explained in the Universal Defendants' moving papers, was accused of physically threatening another extra, Ashland Thomas, while on the set of *Chicago Med*. Extras Casting Director Joan Philo investigated by interviewing Thomas, Nance and female extra Christie Tate, while her assistant, Kristin Swain, spoke with female extra Jennyfer Mumper. Philo shared her findings with Unit Production Manager Jeanne Caliendo, who then discussed the matter with NBCUniversal Senior Director, Human Resources, Darren Chiappetta and NBCUniversal Senior Vice President, Production Jasmine McCaig. Chiappetta and McCaig then jointly decided Nance should no longer be cast as an extra on Chicago Med, so instructing Mark Olson, Vice President of Marketing and Operations for Empire Casting (Docket No. 116 at ¶¶ 42-51).

While Nance criticizes the investigation because Philo did not obtain signed statements from him or any of the other individuals whom she interviewed, he does not explain how having signed statements would have made a difference.[6] Nance likewise fails to cite a single case holding that signed statements are needed to make termination decisions or that investigations conducted without them are somehow suspect. *See, e.g., Hardesty v. Kroger Co.*, Case No. 18-3378 (6th Cir. 2019)("[W]hen we evaluate the honesty of an employer's belief, we do not require evidence of an optimal decisional process or a scorched-earth investigation.").

In an effort to create a factual dispute where none exists, Nance denies telling Philo "he'd do whatever it took to get Thomas out of his scene, even if it meant pushing him out of the way." Philo, however, did not base her findings on this or any other individual statement, but rather on the entire body of evidence gathered during her investigation. As such, Nance cannot avoid

---

[6] Indeed, there is no record evidence that obtaining signed statements is the "normal" practice for Empire Casting, so Nance cannot establish any deviation from standard practices.

6

summary judgment simply by denying one statement attributed to him.[7] As the Universal Defendants explained in their moving papers, the question is not whether Nance admitted to threatening to forcefully remove Thomas from the scene, but whether those who made the decision to ask that he no longer be cast on *Chicago Med* believed he had. *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008) ("The question is not whether the underlying… incident occurred; rather, the issue is whether the employer honestly and reasonably believed that the underlying … incident occurred.").

Nance also takes issue with the fact that Philo—named as a respondent in the EEOC charges he filed earlier that same year—conducted the investigation into Thomas' accusation against him. While Philo's involvement might conceivably be relevant to a Title VII (or Section 1981) retaliatory termination claim, both such claims against the Universal Defendants have already been dismissed. The fact that Nance previously accused Philo of discrimination does not make it more (or less) likely that she failed to conduct a reasonable investigation into Thomas' allegations *because of Nance's race*.

While Nance quibbles with various aspects of the investigation that resulted in his removal from *Chicago Med* he fails to explain why or how a reasonable employer would have reached a different result. He cannot avoid summary judgment with these arguments or the record evidence.

> 2. *The Undisputed Record Evidence Does Not Suggest That Similarly Situated Non-Black/African American Extras Were Treated Better Than Nance*

Although the similarly-situated inquiry is flexible, common-sense, and factual, there must be enough common features between the individuals at issue to allow a meaningful comparison. *Coleman v. Donahoe,* 667 F. 3d 835, 841 (7th Cir. 2012) (the proposed comparator must be

---

[7] In any event, Nance admits that there was some altercation with Thomas. (*See* Docket No. 128 at ¶46).

similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision). There are no such common features here. To the contrary, there are numerous reasons why Nance cannot compare himself to Ashland Thomas or the Caucasian nurses he contends told other extras how to conduct themselves while on set.

As a threshold matter, Nance was removed from Chicago Med not because he was *accused* of threatening another extra with physical harm but rather because *he was believed to have made such a threat* after an investigation into the allegation. As such, Nance cannot avoid summary judgment by comparing himself to an extra accused of making threats but not believed to have done so. Nance thus cannot compare himself to Thomas because the Universal Defendants did not conclude that Thomas physically threatened Nance. It is not enough for Nance to allege that he "reported to Joan Philo and Kristin Swain, [that] Ashland Thomas (white, male) was bullying him, and when [he] told Ashland to stop Ashland told [him] to shut up." (Docket No. 130 at ¶ 27).

*First*, even if this were true—and it is not—an employer is entitled to resolve competing claims from parties to an incident, which is what happened here. *See, e.g., Knight v. State of Florida Dept. of Transportation*, No. 07-12606 (11th Cir. 2008) ("In reaching an employment decision, an employer is free to weigh the credibility of different witnesses[.]"); *EEOC v. Total System Services, Inc.*, 221 F.3d 1171 (11th Cir. 2000) ("the employer can lawfully make a choice between the conflicting versions"); and *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410 (8th Cir. 2010) ("an employer who investigates allegations of workplace misconduct is entitled to latitude in evaluating the information gathered…").

*Second*, Nance did not come forward to accuse Thomas of threatening him; instead he merely made this statement after being questioned about Thomas' accusation against him. Putting Thomas aside, Nance does not point to any record evidence that any extras were accused of making threats of physical harm by someone who expressed fear or concern for their safety.

*Third*, and perhaps most significantly, Nance went out of his way to downplay what he said about Thomas, immediately characterizing it as a "harmless incident" when he sensed Philo and Swain were startled by what he had said. Indeed, Nance described the exchange as follows:

> When I told Joan and Kristin Ash hollered at me and told me to shup up, Joan and Kristin were startled. *I had to tell them it was harmless*. Ash wanted me to stop talking to him so he said shut up and walked away. *I didn't go report anything. There was nothing to report* besides Ash trying to get camera time and breaking continuity to do it.

(Docket No. 131-1 at F-5) (emphasis added).

Nance has not shown any evidence that Universal Television/NBC Universal did not believe that he threatened Thomas, nor has he proffered any admissible evidence that the decision to no longer cast him was made *because of his race*.

Nance is also unable to avoid summary judgment by comparing himself to the "4 to 5 white female nurses who were background/extras… telling other background/extras (doctors, nurses and med techs) how to do their job without permission to do so by Directors or production." (Docket No. 130 at ¶ 10). Although there is no record evidence that anyone complained to the Universal Defendants that these women were threatening other extras with physical violence, Nance tries to avoid summary judgment by characterizing their officious behavior by contending that they "intimidated, threatened and harassed" Sandy Reinstein, another extra. His effort is unavailing because as he himself acknowledges when describing the alleged conduct of these nurses, they "intimidated, threatened and harassed" Reinstein by "telling

her *how to do her job* after a production assistant told her (Sandy) how to do her job." (Docket No. 130 at ¶ 11). No reasonable factfinder could equate the conduct attributed to these 4 or 5 white female nurses with Thomas' accusation that Nance physically threatened him.[8] Which, in turn, precludes Nance from arguing that the Universal Defendants' alleged inaction with respect to these women (the record is devoid of proof as to whether any action was taken—it is silent on the issue) is evidence that he was treated differently because of his race.

These "4 to 5 white female nurses" are also not valid comparators because there is no record evidence that Reinstein ever approached Philo or any other management representative to accuse them of physically threatening her or anyone else. Indeed, Nance states only that he told Assistant Director Patrick Priest and Philo "what happened to Sandy." (Docket No. 130 at ¶ 12). Confirming that the Universal Defendants reasonably viewed Nance's report as a simple dispute among extras and not a threat of physical violence, Nance describes in his response to the Universal Defendants' 56.1 Statement how Priest held a meeting—after speaking with Nance about "negative behaviors" on set—with all of the extras to discuss the suspension of disbelief that should be observed while filming a television show. (Docket No. 128 at ¶ 15). No investigation was opened because nobody reported that a threat of violence had been made.

Summary judgment is thus appropriate on Counts I and II of Nance's Third Amended Complaint.

---

[8] Nance contends that Reinstein told him about the actions of these 4 or 5 women (Docket No. 128 at ¶ 15). Because there is no record evidence that Nance personally witnessed their alleged conduct, he is unable to establish that they did, in fact, engage in said conduct because the statements allegedly made by Reinstein are inadmissible hearsay. *See* Fed. R. Evid. 801(c); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 368 (7th Cir. 1996) ("a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment").

  E. <u>There is No Record Evidence That Open 4 Business Productions or Joan Philo Casting Discriminated Against Nance</u>

  Nance fails to cite any record evidence in his opposition papers suggesting that he was employed by Open 4 Business Productions or Joan Philo Casting. Indeed, Nance makes no argument in his memorandum (Docket No. 129) nor includes any statements of fact regarding the existence of an employment relationship with Open 4 Business Productions in his Rule 56.1 Statement (Docket No. 130). He has, as such, effectively abandoned any such claims and summary judgment must be granted to Open 4 Business Productions on all counts remaining against it.

  While Nance attempts to address the Universal Defendants' argument that he failed to state a claim against Joan Philo Casting, he does not cite to any admissible record evidence that enables him to maintain those claims. Nance responds to the Universal Defendants' contention that Philo was employed at all relevant times either by Universal Television or Empire Casting by stating only that "Philo promoted Joan Philo Casting as she recruited individuals for various television shows…[and] Plaintiff has always believed that he was hired to work on the television shows Empire in 2014, Chicago Med, Chicago PD, and Chicago Fire by Joan Philo Casting." (Docket No. 128 at ¶ 2). Nance then adds in his Rule 56.1 Statement that "Joan Philo Casting (Joan Philo) is a defendant this case, who plaintiff reported to EEOC alleging she violated Title VII and ADEA…" (Docket No. 130 at ¶ 3). Lastly, Nance states in his memorandum that he received two emails from Joan Philo Casting even though Philo denies in her declaration having a company or other entity named Joan Philo Casting. These efforts are unavailing.

  The Universal Defendants do not dispute that Joan Philo maintained a website that referred to Joan Philo Casting. Nance's assertion that he received two emails from Joan Philo Casting, however, is not enough to create an issue of fact regarding his claim that he was

11

employed by Joan Philo Casting. Indeed, the first email referencing Joan Philo Casting/Chicago Fire appears to come from cfseason4@gmail.com (Docket No. 131-12 at PageID #1796) while the second email referencing Joan Philo Casting comes from firstdatesextra@gmail.com (Docket No. 131-12 at Page ID #1797-98). Taken together these emails show, at most, that Joan Philo sent emails from different email accounts depending on the shows for which she was casting extras. These emails are not, though, evidence that Joan Philo Casting ever employed Nance or anyone else. Absent any record evidence that there is an entity named Joan Philo Casting capable of being sued, summary judgment should be granted on Nance's claims against Joan Philo Casting.[9]

### III.  CONCLUSION

Nance's subjective belief that he was discriminated against may be genuine, but he has failed to bring forth any record evidence that he was treated differently than any other *Chicago Med* extra because of his race during Season 1 or Season 2. Nance has also failed to show that he engaged in conduct of any sort protected by the Equal Pay Act when he complained to the IDOL about the manner in which he and other extras were paid by Empire Casting. For the reasons stated in their initial moving papers and above, the Universal Defendants Motion for Summary Judgment should be granted in its entirety.

---

[9] Nowhere in his Third Amended Complaint nor in his opposition papers does Nance contend that he seeks to bring claims against Joan Philo as an individual although he had ample opportunity to do so with each iteration of the complaints he filed. Even if the Court construed Nance's claims against Joan Philo Casting as a claim against Philo herself, summary judgment would be appropriate on any such claim. First, Philo's casting decisions are protected by the First Amendment as explained in the Universal Defendants' moving papers (Docket No. 115 at 10-11, 15). Second, Nance does not point to any evidence in the record suggesting that Philo discriminated against him because of his race when investigating Thomas' complaint that Nance threatened him.

DATED: May 3, 2019	Respectfully submitted,

/s/ Aaron Gelb
Aaron Gelb
Mark Trapp
Conn Maciel Carey LLP
53 West Jackson Boulevard
Suite 1328
Chicago IL 60604
(312) 868-0294
agelb@connmaciel.com

*Attorneys for the Universal Defendants*

13

## CERTIFICATE OF SERVICE

I, Aaron R. Gelb, certify that true and accurate copies of the Reply Memorandum in Support of the Universal Defendants' Motion for Summary Judgment was served on May 3, 2019 by email and US Mail upon:

Fred Nance, Jr.<br>
17239 Evans Avenue<br>
South Holland, IL 60473<br>
frednance@clickservices.org

/s/ Aaron Gelb
Aaron R. Gelb